In the Matter of RULES AND REGULA-TIONS GOVERNING the USE, CONTROL, AND PROTECTION OF WATER RIGHTS FOR BOTH SURFACE AND UNDERGROUND WATER LOCATED IN the RIO GRANDE AND CONEJOS RIVER BASINS AND THEIR TRIBUTARIES.

ALAMOSA–LA JARA WATER USERS PROTECTION ASSOCIATION, Terrace Irrigation Company, Trinchera Water Conservancy District and Trinchera Irrigation Company, Conejos Water Conservancy District, Jeris A. Danielson, State Engineer of the State of Colorado, and Steven E. Vandiver, Division Engineer, Water Division No. 3, State of Colorado, Manassa Land and Irrigation Company, Mogote Northeastern Consolidated Ditch Company and Romero Irrigation Company, Appellants,

v.

Oliver GOULD and Faye Gould et al., Appellees.

No. 80SA288.

Supreme Court of Colorado, En Banc.

Dec. 5, 1983.

As Modified on Denial of Rehearing Jan. 23, 1984.

Kirk B. Holleyman, Aspen, for appellants
The Alamosa-La Jara Water Users Protection Ass'n and The Terrace Irr. Co.

Edwin J. Lobato, O. John Kuenhold,
Kuenhold & Lobato, Alamosa, for appellants Trinchera Water Conservancy Dist.
and Trinchera Irr. Co.

Carlos F. Lucero, Carlos F. Lucero, P.C.,
Alamosa, David L. Harrison, Moses, Wittemyer, Harrison & Woodruff, P.C., Boulder, William A. Hillhouse II, Joseph P.
McMahon, Jr., Felicity Hannay, Davis, Graham & Stubbs, Denver, for appellant Conejos Water Conservancy Dist.

J.D. MacFarlane, Atty. Gen., Charles B.
Howe, Deputy Atty. Gen., Joel W. Cantrick,
Sol. Gen., William A. Paddock, Asst. Atty.
Gen., Donald H. Hamburg, Sp. Asst. Atty.
Gen., David Aschkinasi, Asst. Atty. Gen.,

David W. Robbins, Sp. Asst. Atty. Gen.,
Friedman, Hill & Robbins, Denver, for the
State of Colo., Appellants State Engineer
and Div. Engineer, Water Div. No. 3.

John C. McClure, Susan M. Thevenet,
Smart, Defurio, Brooks & Eklund, Denver,
Gordon J. Bosa, Bosa & Stokes, P.C., Alamosa, for appellants Manassa Land and Irr.
Co., Mogote Northeastern Consolidated
Ditch Co., and Romero Irr. Co.

M.E. MacDougall, Geddes, MacDougall,
Geddes & Paxton, P.C., Colorado Springs,
George W. Woodard, Alamosa, for appellee
San Luis Valley Well Owners, Inc.

Michael D. White, William R. Devine,
David F. Jankowski, Nossaman, Guthner,
Knox & Elliott, Denver, for San Luis Valley
Municipalities: City of Alamosa, Conejos
Water and Sanitation Dist., Guadalupe
Water Ass'n, Town of La Jara, and City of
Monte Vista.

Robert S. Wham, Shoemaker, Wham, Krisor & Bendelow, Denver, for Rio Grande
Water Conservation Dist.

John U. Carlson, John H. Land, Paul D.
Frohardt, Holland & Hart, Denver, for appellees Rio Grande Water Users Ass'n, Centennial Ditch Co., Chicago Ditch Co., Costilla Ditch Co., Commonwealth Irr. Co., Excelsior Ditch Co., The Grant Ditch, Independent Ditch Co., Monte Vista Water Users
Ass'n, Lariat Ditch Co., Prairie Ditch Co.,
Santa Maria Reservoir Co., San Luis Valley
Canal Co., San Luis Valley Irr. Dist., Senior
Water Rights Ass'n, Rio Grande and Piedra
Valley Ditch Co., Billings Ditch Co., and Rio
Grande Canal Water Users Ass'n.

DUBOFSKY, Justice.

This is an appeal from a judgment of the
district court for Water Division 3 (water
court) regarding rules promulgated by the
Colorado State Engineer [1] (proposed rules)

---

1. Section 37–80–104, C.R.S. gives the state engineer the authority to make and enforce regulations with respect to deliveries of water as will enable the state of Colorado to meet its compact commitments (the compact rule power). If the compact is "deficient in establishing standards for administration within Colorado ..., the state engineer shall make such regulations as will be legal and equitable to regulate distribution among the appropriators within Colorado obligated to curtail diversions to meet compact commitments...." Rules adopted under the compact rule power are within a water court's jurisdiction. *Kuiper v. Gould,* 196 Colo. 197, 583 P.2d 910 (1978). The rules here also were adopted under section 37–92–

limiting the use of surface and underground water in the San Luis Valley. Curtailment of water use in the valley is required by the terms of an interstate stipulation under which Colorado must meet its Rio Grande Compact (compact) obligation to deliver scheduled amounts of Rio Grande water at the Colorado-New Mexico border on an annual basis. The dispute over the proposed rules concerns the distribution of that curtailment: between Rio Grande and Conejos River water users, between Rio Grande mainstem and tributary users, and between well owners and surface diverters. The water court approved rules for administering separate obligations for deliveries from the Conejos River and the Rio Grande mainstem, and disapproved rules which phased out all wells in the San Luis Valley unless each well owner could demonstrate a lack of material injury to senior surface water users or provide a plan of augmentation to replace the water taken by a well. The water court also held that the compact applies to all tributaries of the Rio Grande. We reverse the water court's tributary ruling and affirm its separate delivery and underground water rulings.

## I.

The San Luis Valley in south-central Colorado extends approximately ninety miles from north to south and fifty miles from east to west at an elevation varying between 7,500 feet and 8,000 feet above sea level. The major mountain boundaries are the San Juan mountains to the west and the Sangre de Cristo mountains to the east.[2] The Rio Grande mainstem rises in the San Juan mountains, flows south-easterly through the valley to Alamosa, and then runs south through a break in the San Luis hills, which border the valley on the south, into the state of New Mexico, then along the border between Texas and Mexico, emptying into the Gulf of Mexico. The Conejos River rises in the Conejos Mountains to the south-west and flows north-easterly along the southern edge of the valley, joining the Rio Grande mainstem at Los Sauces. Despite its high altitude, short growing season, and average annual precipitation of only about 7.5 inches, the valley sustains a productive agricultural economy dependent upon irrigation water.

The upper 6000 feet of fill below the valley surface consists of unconsolidated clay, silt, sand, and gravel, and interbedded lava flows, containing an estimated two billion acre-feet of underground water. Some of the underground water is in an unconfined aquifer system at shallow depths. Beneath the unconfined aquifer are relatively impermeable beds of clay and basalt and beneath these confining layers are substantial quantities of water which comprise the confined aquifer. The confining clay layer generally does not exist around the valley's perimeter, and the confined aquifer system is recharged from surface flow to the underground water system at the edges of the valley. Because the recharge areas are higher in elevation than the floor of the valley, the confined aquifer is under artesian pressure, resulting in the free flow of water from some artesian wells and springs at natural breaks in the confining layer. In some places, where the confining layer is less thick and more transmissive, water from the confined aquifer will leak upward through the confining clay lay-

501, C.R.S. (the water rule power). Section 37–92–501(1) provides that "[t]he state engineer and the division engineers shall administer, distribute, and regulate the waters of the state in accordance with the constitution of the state of Colorado, the provisions of this article, and other applicable laws.... The state engineer may adopt rules and regulations to assist in, but not as a prerequisite to, the performance of the foregoing duties." We have held that an action to determine the validity of rules and regulations promulgated by the state engineer under the "Water Right Determination and Administration Act of 1969," sections 37–92–101, et seq., C.R.S. is within the exclusive jurisdiction of the water judge. *State of Colorado v. Southwestern Colorado Water Conservation District,* 671 P.2d 1294 at 1309, n. 20 (1983); *Kuiper v. Well Owners Conservation Ass'n,* 176 Colo. 119, 490 P.2d 268 (1971).

2. Appendix A is a map of the San Luis Valley indicating the general boundaries of the valley, the surface streams, and the inflow and outflow gauges referred to in the Rio Grande Compact.

ers into the unconfined aquifer. The unconfined aquifer is directly connected with the surface streams in some places. To varying degrees, the surface streams, the unconfined aquifer, and the confined aquifer are hydraulically connected.[3]

The first appropriations from streams in the valley began in the 1850s on the Conejos River. The first appropriation on the Rio Grande mainstem was in 1866, and the most extensive development for irrigation purposes on both rivers was between 1880 and 1890. By 1900, the natural flow of all surface streams in the valley was over-appropriated. High spring runoff and low summer flows in valley streams, coupled with years of severe drought, resulted in undependable water supplies for irrigation; thus, farmers turned to wells and reservoirs to supplement and regulate their water supply.[4]

Well construction in the valley began as early as 1850. Between 1880 and 1891, about 2,000 artesian wells were drilled. Withdrawals from the confined aquifer by wells remained relatively constant until the early 1950s when a number of large capacity wells were constructed. In 1972, the state engineer ceased issuing permits for wells to be drilled into the confined aquifer after determining that both aquifers were tributary to the surface streams in the valley, based on studies by the United States Geologic Survey and state water agencies. There are more wells on land irrigated by surface water from the Rio Grande mainstem than on land in the Conejos River Basin because many of the Conejos farms are too small to use sprinklers connected to

wells and wells in the Conejos River Basin west of Antonito must be drilled to such depths that pumping them is uneconomical.

Since before the turn of the century, valley water users have had to contend with out-of-state demands for Rio Grande water. In 1896, complaints and claims for damages from the Republic of Mexico led the United States Department of Interior to deny permission for the utilization of federal land in the construction of most reservoirs planned for the valley. The dispute with Mexico was resolved by treaty in 1906, 34 Stat. 2953 (1906), but the next year, the United States Supreme Court, in *Kansas v. Colorado*, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907), articulated the doctrine of equitable apportionment, opening the door for the assertion of justiciable rights to Rio Grande water by the states of New Mexico and Texas.

To avoid litigation, Colorado, New Mexico, and Texas began in 1923 to make efforts towards a negotiated apportionment of Rio Grande water. Negotiators from the three states signed a permanent compact in 1938. The compact subsequently was ratified by the legislature of each state and approved by the United States Congress in 1939. 53 Stat. 785 (1939). Codified at section 37–66–101, C.R.S., the compact obligates Colorado to deliver water in the Rio Grande at the New Mexico border based upon two schedules tying delivery obligations to levels of inflow, as measured at upstream gauges on the Rio Grande mainstem and the Conejos River, to which is added the flow of the Los Pinos and San Antonio rivers (tributaries of the Conejos) measured near Ortiz, New

**3.** North of the Rio Grande mainstem, a hydraulic divide provides the southern boundary of an area known as the Closed Basin. Four large mutual irrigation systems supply water from the mainstem to irrigate the agricultural land in the basin. Return water from irrigation and small streams within the basin flow toward the sump, the basin's lowest surface area, rather than returning to the mainstem, and consequently, most of the water is lost to evapotranspiration.

**4.** Wells offer a number of advantages for the irrigator. As described in Hillhouse, *Integrating Ground and Surface Water Use in an Ap-*

*propriation State,* 20 Rocky Mtn.Min.L.Inst. 691, 696 (1975):

"While the cost of pumping may exceed the costs of delivering surface water to the farm, the water is available at the flip of a switch. The curse of the unreliable supply is largely eliminated: the water is there when the farmer needs it, not when the ditch is able to divert under what may be a marginal surface priority. Transportation losses are minimized because the water is diverted at or near the point of application. Wells are compatible with efficient sprinkler systems for applying irrigation water."

Mexico. The amount of required discharge varies according to natural supply. In low water years, small deliveries are required; in high water years, large deliveries are required. The compact fixes Colorado's overall obligation in the equitable interstate apportionment of the Rio Grande at a level intended to protect water use as it existed from 1928–1937 (the compact study period). In recognition that variations from predicted performance for each river would occur in the future because of the sequencing of wet and dry years, variable runoff patterns,[5] and new depletions, the compact allows accumulated debits up to 100,000 acre-feet. *See* Article VI of the compact.[6]

Beginning in 1952, Colorado accumulated debits in excess of 100,000 acre-feet. Colorado water officials did not curtail surface appropriations to satisfy the compact, and by the end of 1965, Colorado's accrued debit was 939,900 acre-feet. In 1966, Texas and New Mexico brought an original proceeding before the United States Supreme Court seeking repayment by Colorado of the accrued debit. The three states filed a motion for continuance, stipulating that the litigation would be stayed if Colorado met its delivery obligation on an annual basis, without an allowance for accumulated debits, and used all available administrative and legal powers, including curtailment of diversions, to assure annual compliance. This motion was granted by the United States Supreme Court. *Texas v. Colorado,* 391 U.S. 901, 88 S.Ct. 1649, 20 L.Ed.2d 416 (1968).

Governed by the stipulation, the state engineer is required to administer the Conejos River and Rio Grande mainstem on the basis of projected annual runoff. Since 1968, when the state engineer began enforcing the stipulation, water users on both the Conejos and Rio Grande have experienced substantial curtailments of their diversions.

Between 1969 and 1975, the state engineer developed annual operating criteria to deliver water to the state line.

In 1975, the state engineer promulgated the proposed rules, publishing them in all counties of Water Division No. 3, which is generally coterminous with the San Luis Valley. The proposed rules fall into three categories. First, the separate delivery rules identify the respective obligations of the Conejos River and the Rio Grande mainstem to deliver water according to schedules, applicable to each stream, in Article III of the compact. The effect of these rules is to subject use on each river to separate administration. Second, the tributary rule provides that the state engineer has the authority to require curtailment of all tributaries of the Rio Grande to satisfy compact obligations. Third, the underground water rules provide for the phasing out of underground water diversions unless the underground water user submits proof to the division engineer that the user's well is operating under a decreed plan of augmentation or has a decree as an alternate point of diversion, or that the underground water appropriation can occur without impairing the right of a senior appropriator.[7] Numerous protests to the proposed rules were filed, requiring a hearing before a water judge under section 37–92–501(2)(h), C.R.S.

The first judge who heard the case remanded the proposed rules to the state engineer on the belief that the underground water rules were adopted under different statutory authority than the separate delivery and tributary rules and therefore should be promulgated separately. This court, in *Kuiper v. Gould,* 196 Colo. 197, 583 P.2d 910 (1978), reversed the water court's ruling and remanded the proceeding to a different water judge for hearing and disposition of the protests to the proposed rules.

---

**5.** Approximately seventy to eighty percent of the total annual surface water runoff in the San Luis Valley results from melting of the snowpack in the surrounding mountains.

**6.** The pertinent provisions of the compact are included in Appendix B.

**7.** The proposed rules also contain restrictions on non-beneficial winter diversions; provisions concerning storage in pre-compact reservoirs; and a requirement that all artesian wells be equipped with suitable control devices.

A lengthy trial ensued. The state engineer, who is also the ex-officio Rio Grande Compact Commissioner for Colorado, was the proponent of the rules. The Rio Grande Water Users Association, comprised of the mutual ditch companies and individual surface appropriators (the Rio Grande ditches), also advocated the separate delivery rules and the tributary rule. Surface water users on Alamosa, La Jara and Trinchera Creeks, all tributaries to the Rio Grande mainstem (surface water users on the tributaries), challenged the tributary rule.[8] The Conejos Water Conservancy District, which encompasses irrigated lands supplied with water from the Conejos River and its tributaries (the Conejos District), protested the separate delivery rules, but supported the underground water rules.[9] The San Luis Valley Irrigation Well Owners Association (the well owners), whose members own wells throughout the valley, and a number of municipal entities in the valley (the communities), which rely on confined aquifer wells to supply water to their residents, protested the underground water rules.

At trial, the proposed rules' proponents and the protestants submitted documents detailing the legislative history of the compact and testimony from administrators about operative interpretations of the compact. All parties agreed that historical hydrologic patterns in the valley have changed dramatically, particularly since 1950, because of a combination of natural and manmade causes, resulting in an overall reduction in surface water supplies. The state and the Conejos District asserted that the primary cause of the reduction is increased well pumping, but there was also evidence that decreased snowpack runoff and more efficient irrigation are responsible causes. The theories were supported by studies, which contrasted stream system inflow and outflow, and computer modelling, which estimated overall stream depletions from well withdrawals. Farmers testified to the effect of loss of surface water on their ability to grow crops and the need for supplemental well water when surface supplies are undependable. Finally, evidence was presented that the natural consumptive use of water by evapotranspiration from native grasses and phreatophytes, such as cottonwood, greasewood and rabbitwood, accounts for a large portion of the annual loss of water in the valley. Expert testimony indicated, and the water court found, that when wells are pumped, lowering the water table below phreatophyte root zones, the result is a substantial salvage of water, perhaps as much as one million acre-feet a year, that would otherwise be lost through evapotranspiration.

The water court approved the separate delivery rules, holding that the compact was clear on its face in requiring separate delivery obligations. The court also upheld the tributary rule, holding that the compact applies to all tributaries of the Rio Grande, but if the state engineer determines that delivery of water from these tributaries to the mainstem would be futile or wasteful, he has the authority not to curtail diversions. The water court disapproved the underground water rules, suggesting that section 37–92–502, C.R.S. requires that the state engineer must determine that each well causes material injury to a senior appropriator before that well may be curtailed and holding the rules to be inconsistent with the statutory and judicial policy of maximum utilization of water. The court held, relying on section 37–92–102, C.R.S. and *Fellhauer v. People,* 167 Colo. 320, 447 P.2d 986 (1968), that in some instances senior appropriators may be required to drill new wells to augment or replace their surface water diversions before curtailment of junior rights can be required.

---

8. The surface water users include Alamosa-La Jara Water Users Protection Association, Terrace Irrigation Company, Trinchera Irrigation Company, and Trinchera Water Conservancy District.

9. The Mogote Northeastern Consolidated Ditch Company, the Romero Irrigation Company, and Manassa Land and Irrigation Company, three large mutual ditches on the Conejos system (Mogote), are allied with the Conejos District on separate delivery issues.

The Conejos District, and Mogote appeal the water court's decision on the separate delivery rules. The surface water users on the tributaries appeal the tributary ruling. The state and the Conejos District appeal the water court's disapproval of the underground water rules.

## II.

### A.

The proposed rules are based on the premise that the separate delivery schedules provided for the Conejos and Rio Grande in Article III of the compact mandate separate administration of the rivers.[10] This interpretation of the compact reflects administration of the rivers under the compact since 1968 when, as a result of the stipulation with New Mexico and Texas, the Colorado state engineer began to require curtailment of diversions in order to meet compact obligations.

As a result of separate administration of the rivers, senior water rights on the Conejos River have been curtailed at times when users with more recently acquired rights on the Rio Grande have continued to divert water. Moreover, although the Conejos system contributes only thirty percent of the inflow of water to the San Luis Valley, administration in accordance with the compact schedules requires the Conejos system to provide forty-five percent of Colorado's deliveries at the New Mexico state line.

The Conejos District maintains that the Conejos River is a losing stream,[11] and that the state engineer has curtailed a large percentage of inflow at the headgates of the Conejos water users so that the stream will produce the amount required by the compact. In contrast the Rio Grande is a gaining stream, and its delivery obligation is satisfied to a large extent by return flows of water already diverted for irrigation. Since 1968, except for the severe drought years of 1972 and 1977, the state has curtailed diversions to some extent on the Conejos and its tributaries during the irrigation season. The effect of such curtailment in the Conejos area is to reduce the irrigation season by about one week at each end of the season, resulting in numerous hardships on farmers and ranchers in the area. Consequently, intense controversy has developed over whether administration according to the separate delivery schedules of Article III is required by the compact or permissible under state law.

The water court ruled that the compact is clear on its face: the purpose of the separate delivery schedules for the Conejos and Rio Grande in Article III is to establish separate obligations for administration of these two rivers in Colorado. The water court supported its reading of the compact by reference to the compact's legislative history as well as the other factors set forth in section 2–4–203, C.R.S. (1980 Repl.Vol. 1B).[12] The water court found that water

10. Article III, as set out more fully in Appendix B, requires Colorado to deliver to the Colorado-New Mexico state line an amount 10,000 acre-feet less than the sum of the quantities in the two tabulations of relationships. The first tabulation is discharge of the Conejos River; the first column is the quantity of water in the Conejos in thousands of acre-feet at the gauging station near Mogote, and the second column is the discharge of the Conejos River at the gauging station near Los Sauces. The compact contains a similar table for the discharge of the Rio Grande exclusive of the Conejos River. The first column is the quantity in the Rio Grande at the gauging station near Del Norte; the second column is the quantity in the Rio Grande at the Lobatos gauge less the discharge of the Conejos River at its mouth.

11. A losing stream is one in which there are significant river losses other than for diversions below the inflow gauges.

12. Section 2–4–203(1) provides:
"If a statute is ambiguous, the court, in determining the intention of the general assembly, may consider among other matters: (a) the object sought to be attained; (b) the circumstances under which the statute was enacted; (c) the legislative history, if any; (d) the common law or former statutory provisions, including laws upon the same or similar subjects; (e) the consequences of a particular construction; (f) the administrative construction of the statute; (g) the legislative declaration of purpose."
The water court did not find the compact ambiguous but resorted to section 2–4–203 be-

rights on the Conejos River historically have been administered independently of water rights on the Rio Grande mainstem and noted an absence of evidence that compact negotiators intended to break with that history. The court found that the compact negotiators and their advisors intended the compact to continue separate administration of the Conejos River and the Rio Grande mainstem, citing numerous statements by compact principals recognizing separate delivery obligations.[13] The water court, considering the equities of separate delivery, concluded that although adherence to separate delivery schedules yields less water to Conejos appropriators than would a unitary obligation, the Conejos appropriators attain a larger volume of water per acre of irrigated land than do Rio Grande mainstem appropriators. Finally, the water court concluded that even if the compact were silent as to intrastate administration of the two streams, anything other than separate administration would violate section 37–80–104, C.R.S., which provides that when a compact is deficient in establishing standards for administration, its provisions shall be implemented "so as to restore lawful use conditions as they were before the effective date of the compact insofar as possible."

Despite the water court's detailed findings of fact and conclusions of law, the Conejos District (and Mogote, with slightly different emphases)[14] asserts that the compact cannot allocate intrastate water distribution without violating the Colorado Constitution, that the compact is not clear on its face, that the water court misinterpreted the legislative history of the compact, and that the water court's reading of the compact produces inequitable results in violation of section 37–80–104, C.R.S. The

Conejos District contends that a unitary state obligation, which would combine the delivery obligations of both streams as a total obligation for Colorado, to be reallocated in conjunction with the prior appropriation doctrine, best meets the constitutional and statutory prior appropriation doctrine.

In rejecting the argument that an interstate compact cannot allocate intrastate water distribution, since Colorado's Constitution and statutes direct priority administration of water rights, Colo. Const. Art. XVI, §§ 5, 6; sections 37–92–103(10), 37–92–301(3), 37–92–401, and 37–92–501, C.R.S.; Coffin v. Left Hand Ditch Co., 6 Colo. 443 (1882), the water court held, "In an equitable apportionment of an interstate stream, the State of Colorado has legal power and authority to allocate by Compact different burdens and entitlements between various sections of the river. This is especially true where, as here, the burden represents only that quantity of water which was not consumed on each river at the time of the Compact."

We agree. The equitable apportionment of the waters of interstate streams may be accomplished either by the United States Supreme Court, Kansas v. Colorado, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907), or by interstate compact, Colorado v. Kansas, 320 U.S. 383, 64 S.Ct. 176, 88 L.Ed. 116 (1943). Equitable apportionment, a federal doctrine, can determine times of delivery and sources of supply to satisfy that delivery without conflicting with state law, for state law applies only to the water which has not been committed to other states by the equitable apportionment. Hinderlider v. LaPlata River and Cherry Creek Ditch Co., 304 U.S. 92, 58 S.Ct. 803, 82 L.Ed. 1202

cause of the intensity of the controversy surrounding interpretation of the compact.

**13.** One example mentioned by the water court is an analysis submitted by C.L. Patterson, Chief Engineer of the Colorado Water Conservation Board, to the negotiators in March, 1938, which recognized that separate Conejos and Rio Grande "schedules of deliveries" constituted a form of apportionment of Colorado's

responsibilities between the two streams. His report recognized that the schedule adopted was tighter for the Conejos than for the Rio Grande. C.L. Patterson, Analysis of Report of Committee of Engineers to Rio Grande Compact Commissioners Dated December 27, 1937 2–5 (1938).

**14.** Our reference to Conejos District positions includes the Mogote arguments.

(1938). In an equitable apportionment, strict adherence to prior appropriations may not always be possible. *Colorado v. New Mexico,* —— U.S. ——, 103 S.Ct. 539, 74 L.Ed.2d 348 (1982); *Nebraska v. Wyoming,* 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945).

The question before us is how the prior appropriation doctrine may be reconciled with the equitable apportionment of water under federal law, which in this case subjugates the heretofore independent water rights on the Rio Grande mainstem and the Conejos River to a relatively recently created obligation to deliver an equitable share of the rivers' water at the New Mexico state line. As a result of the doctrine of prior appropriation, local economies develop based on vested rights in appropriations, subject to the vagaries of nature, but with settled expectations—arising out of the pattern of development of a water source—as to how water is to be allocated. Under prior appropriation doctrine water is allocated according to chronology because such allocation has the effect of protecting historic patterns of use. This process of development based on vested rights occurred independently on the Rio Grande mainstem and the Conejos River. As the water court found, prior to and at the time of the signing of the compact, there were no decreed diversions from the Rio Grande in Colorado below the confluence of the mainstem and the Conejos. At no time have diversions on one stream been subject to curtailment by senior appropriators on the other.

To hold, as suggested by the Conejos District, that the compact obligation has the effect of re-sorting settled water rights on both streams into a single system of priorities based solely on dates of appropriation would reshuffle the economies of the valley according to a chronology of events unrelated to settled expectations derived from historical patterns of use and reflected

in the independent priority systems. That this result is not compelled by the doctrine of prior appropriation was recognized by the General Assembly in section 37–80–104, C.R.S. which mandates that compacts which are deficient in provision for intrastate administration be implemented so as to "restore lawful use conditions as they were before the effective date of the compact insofar as possible." We agree with the statutory implication that a compact obligation should not be viewed as a senior water right which upsets historical development and reshuffles rights according to a chronological formula. Under the doctrine of prior appropriation, streams which have been independently appropriated remain independent. If the water of those streams becomes subject to equitable apportionment by compact, the streams must be administered as mandated by the compact, or if the compact is deficient in providing for administration, according to section 37–80–104. The separate delivery rules, therefore, are not inconsistent with constitutional and statutory provisions for priority administration of water rights.[15]

The Conejos District argues that the drafters of the compact did not intend for the schedules of Article III to be used other than to define Colorado's state line delivery obligations and to account for the effects of post-compact developments, particularly storage in reservoirs. The Conejos District asserts that historically independent administration in the absence of a defined interstate obligation is irrelevant to the question of which water rights must be curtailed to meet the state line obligation. The district contends that while the streams are separate in that an appropriator on one cannot make a call on decrees on the other, the superseding obligation to deliver water at the state line should be seen as a "senior" downstream obligation which, when necessary, "calls" upstream diversions on a uni-

---

**15.** The Conejos District also argues that the proposed rules were adopted under authority of the stipulation in *Texas v. Colorado, supra,* rather than under authority of the compact and that the stipulation makes no mention of separate delivery obligations. Because the compact provides adequate authority for the separate delivery rules, however, and was clearly relied upon by the state engineer, we need not reach the question of whether the stipulation in and of itself provides adequate authority for the rules.

tary basis in accord with the doctrine of prior appropriation. This approach would view the generally older Conejos diversions as senior to most of the Rio Grande diversions and thus result in significantly more Rio Grande than Conejos diversions being curtailed for compact purposes.

Accepting, *arguendo,* the Conejos District's interpretation, we are left with the question of what the purpose of the separate delivery schedules in Article III might be. Since Article III identifies circumstances in which "application of these schedules" is to be adjusted, we must conclude that the schedules were intended to be applied in some fashion. The Conejos District's argument is that these schedules were intended to allow Colorado to keep track of the responsibilities of various storage facilities for any debits and credits which accrue in Colorado's compact obligations.[16] While there is legislative history indicating that the compact negotiators expected the schedules to be used to allocate credits and debits to post-compact reservoirs,[17] this intended use does not adequately explain the presence of separate schedules in Article III. If a unitary obligation had been intended, there would have been no need for separate accounting of storage since under a unitary obligation any post-compact reservoir would contribute to the

overall Colorado delivery based on its relative priority, irrespective of the stream upon which it was located. Therefore, we conclude that the schedules must have been intended to govern separate administration of the Rio Grande and Conejos River.

■ The Conejos District argues that the separate delivery rules are illegal and inequitable in violation of section 37–80–104, C.R.S. which provides:

"The state engineer shall make and enforce such regulations with respect to deliveries of water as will enable the state of Colorado to meet its compact commitments. In those cases where the compact is deficient in establishing standards for administration within Colorado to provide for meeting its terms, the state engineer shall make such regulations as will be legal and equitable to regulate distribution among the appropriators within Colorado obligated to curtail diversions to meet compact commitments, so as to restore lawful use conditions as they were before the effective date of the compact insofar as possible."

Because we do not believe that the compact is deficient in establishing standards for administration within Colorado, we hold that, other than as the source of the com-

---

**16.** Article VI of the compact provides that Colorado is not to incur an annual or accrued debit in excess of 100,000 acre-feet unless caused by holdover storage of water in reservoirs constructed after 1937. Article VI also provides that within the storage capacity of such reservoirs Colorado is to retain enough water to meet its accrued debit. If Colorado overdelivers under the schedules, the compact also provides for recoupment of a credit by storing water in post-compact reservoirs. In addition, if Elephant Butte Reservoir in New Mexico spills or would have spilled but for any portion of water stored in post-compact reservoirs in Colorado, the stored water becomes the property of the owners of the post-compact reservoir and the accrued debit is wiped out.

The only reservoir constructed in the valley after 1937 was Platero Reservoir, built in 1951 on the Conejos. The Platero Reservoir has never stored more than a small amount of water.

**17.** The text of the engineers' report includes the following: "A consistent relationship has long

been noted between the combined inflow of the major streams to San Luis Valley and outflow of the Rio Grande at Lobatos. This relationship, however, may be disturbed in the future due to construction of storage reservoirs, and we have therefore prepared separate schedules applicable to the Conejos and Rio Grande stream systems. This is a departure from previous plans but has no practical disadvantage and has certain definite advantages; variations in discharge of the contributing streams will automatically be taken into account, particularly if storage reservoirs are constructed; and it will also enable the San Luis Valley water users to apportion among themselves their relative responsibility for meeting the obligation of Colorado." *Proceedings of the Meeting of the Rio Grande Compact Commission Held at Santa Fe, New Mexico, March 3rd to March 18th, inc. 1938,* app. 1, "Report of Committee of Engineers to Rio Grande Compact Commissioners Dated December 27, 1937" 40–41.

pact rule power, section 37–80–104 has no application to the instant case.

We affirm the water court's holding that the compact is clear on its face and thus affirm the court's approval of the separate delivery rules. Despite the introduction of massive amounts of legislative history, the Conejos District has been unable to explain away the presence of the separate delivery schedules of Article III. These schedules could only have been included for the separate administration of each stream's compact obligations. We note that the legislative history [18] and administrative history [19] support the water court's holding, but we do not consider it necessary to employ these or the other statutory construction aids set out in section 2–4–203, C.R.S. (for interpretation of ambiguous statutes) to interpret a clear statute. *See Aranda v. Patterson*, 146 Colo. 424, 361 P.2d 782 (1961).

Because we are convinced that the separate delivery obligation is clear on the face of the compact, we hold that the separate delivery rules have a reasonable basis in law. *Ricci v. Davis*, 627 P.2d 1111 (Colo. 1981). Although the impact on the Conejos River of separate delivery administration has been severe, particularly on the small farmers and ranchers who depend exclu-

sively on a surface supply, the state engineer did not have any means of addressing that problem in the exercise of his compact rule power; the state engineer did use his water rule power to address the supply problems in the Conejos Basin by means of well regulation. *See* Part III, *infra.*

B.

The proposed tributary rule includes Alamosa Creek, La Jara Creek and Trinchera Creek within the state engineer's power of administration to secure delivery of water to meet the compact obligation.[20] The water court concluded that the compact applies to all tributaries of the Rio Grande,[21] but held that the state engineer may choose not to curtail diversions on the three creeks, if he determines that delivery of water from these tributaries to the mainstem of the Rio Grande would be futile or wasteful. We reverse, concluding that the compact negotiators did not intend to include Alamosa, La Jara, and Trinchera Creeks under compact administration.

Trial testimony established that Alamosa Creek and La Jara Creek flow through flat land, the stream channels are not clearly defined, and practically no water from either creek reaches the Rio Grande except

---

**18.** *E.g.* R.J. Tipton, *Analysis of Report of Committee of Engineers to Rio Grande Compact Commissioners Dated December 27, 1937* 16 (1938) (Colorado Engineer-Advisor Royce J. Tipton's discussion of the protections for both basins built into the compact, indicating that the separate delivery schedules were intended to enable valley water users to fix responsibility for any debits and credits which might accrue in meeting Colorado's compact obligation); M.C. Hinderlider, *Notes on Meeting of Rio Grande Compact Commission at Santa Fe, March 10, 1938* (The Colorado Compact Commissioner's description of a Rio Grande Compact Commission comparison of the tightness of each schedule, indicating that the burden of fulfilling a schedule applied to a particular stream); M.C. Hinderlider, *Analysis of Compact* 21 (used in aid of ratification, stating "The separation of the stateline schedule into the two parts will permit the fixing of responsibility for any depletion").

**19.** Neither stream was administered for compact purposes until 1968, when the stipulation forced Colorado to meet its state line obligation

on an annual basis. However, beginning in 1939, the Rio Grande Compact Commission has kept precise records of how the Conejos and Rio Grande mainstem performed in accordance with the separate schedules of Article III. After 1969, the administrators charged by the stipulation with enforcing the compact interpreted it as requiring separate delivery obligations.

**20.** Rule II(A) subjects all surface water tributary to the Rio Grande or the Conejos River (without specific reference to Alamosa, La Jara and Trinchera Creeks) to administration to the extent necessary to deliver the amount of water required by the compact. The state engineer's brief concedes that the tributaries could not be administered on percentage curtailments based on daily inflows to the Del Norte gauge. The state engineer makes no suggestions as to how he would administer the tributaries.

**21.** Apparently, the state engineer conceded that the surface flows of Culebra Creek and Rock Creek are not subject to the tributary rule.

during periods of flooding. The Alamosa Creek channel ends about eight or nine miles from the Rio Grande and the water spreads out and is absorbed by meadowland. The La Jara Creek channel is small, crooked, and obstructed with beaver dams. Most of the water soaks away or spreads over meadows before it reaches the Rio Grande. Both Alamosa Creek and La Jara Creek have their own reservoirs and the water supplies of the creeks were fully utilized by the time of the compact study period. The Trinchera Creek streambed, below two reservoirs, is obstructed with willows, beaver dams, and man-made dams. Water reaches the Rio Grande only under flood conditions, or as underground flow. Priorities on all three creeks always have been administered separately from those on the Rio Grande mainstem. The creeks have not been successfully administered for compact purposes.[22]

The water court recognized that, at the time of the compact study period, irrigation development and water use on the tributaries were such that the streams contributed little water to the mainstem except occasional flood flows. Because of this, the compact negotiators made no provision for gauging stations for the streams and made no specific allowance for their flow in the delivery schedules of Article III. The water court concluded, however, that the omission of gauging stations did not exclude the tributaries from the compact obligation since Article III(4) refers to the total flow of the Rio Grande at the gauging station near Lobatos, less the discharge of the Conejos River at its mouth. The court noted that although the compact makes no mention of Alamosa Creek, La Jara Creek, or Trinchera Creek, it does not specifically exclude them.

The tributary users urge the significance of the absence from the compact of delivery schedules or provision for gauging stations for the creeks, contrasting the fact that the compact specifically includes in a delivery schedule the natural flow of both the Los Pinos and San Antonio Rivers (tributaries of the Conejos), and establishes gauging stations for them. Since the delivery schedules of Article III were intended to protect pre-existing uses, identifying only the remaining amount of water as subject to delivery at the state line, the tributary surface users argue that had the compact negotiators prepared a schedule for the creeks, the delivery obligation would have been zero.

The state, the Rio Grande ditches, and the Conejos District, seeking compact contributions from the tributary surface water users, rely on specific provisions of the compact. Article I(c) of the compact defines "Rio Grande Basin" as "all of the territory drained by the Rio Grande and its tributaries in Colorado. . . ." Article I(e) of the compact defines "tributary" as "any stream which naturally contributes to flow of the Rio Grande." The parties seeking contributions note that there are many tributaries to the Rio Grande and the Conejos River which were not named in the compact and for which delivery schedules were not supplied. In addition, these parties argue that the compact specifically mentioned gauging stations on the Los Pinos and San Antonio only because such gauging stations were necessary to prevent distortion of inflow-outflow correlations which would have skewed the delivery obligation schedules, while, because the Alamosa, La Jara, and Trinchera Creeks all had pre-compact reservoirs, their contribution to the Rio Grande mainstem was too small in comparison with the total inflow to significantly distort the compact study period analysis.[23]

We conclude that the compact is ambiguous: it could be read to include all tributaries of the Rio Grande and the Conejos River, or it could be read to authorize administration only of those streams which significantly contributed to the outflow of the Rio

<hr />

22. The state engineer once attempted to administer Alamosa Creek for compact purposes, but all of the water was lost in transit.

23. The Conejos District argues that the compact did not provide schedules for these streams because no post-compact reservoirs were contemplated.

Grande at Lobatos during the compact study period. Interpretation of ambiguous legislation requires resort to its history, here represented by evidence of the intent of the compact negotiators. *See* section 2–4–203, C.R.S.

R.J. Tipton, Colorado's engineering-advisor to the compact commissioner, observed in 1935 that "[t]he interstate problem in the San Luis Valley concerns in general only the Rio Grande above Alamosa, and the Conejos River and its tributaries.... " R.J. Tipton, *Analysis of Report of Committee of Engineers to Rio Grande Compact Commissioners Dated December 27, 1937,* app. "Extracts from Resume of the Problem Concerning the Rio Grande above Fort Quitman, Texas, by R.J. Tipton, July, 1935" 7 (1938).[24] The Alamosa, La Jara, and Trinchera Creeks enter the Rio Grande below Alamosa.

The Rio Grande Joint Investigation found that the demands upon streams in the valley other than the Rio Grande and the Conejos "are not of concern [in developing an equitable division of water] ... since other than by occasional flood flows these streams contribute practically no water to the flow of Rio Grande leaving the valley." National Resources Committee, *Regional Planning, Part VI—The Rio Grande Joint Investigation In the Upper Rio Grande Basin in Colorado, New Mexico, and Texas, 1936–1937* 93 (1938). The Rio Grande Joint Investigation also found that "high transportation and other losses in the use of the available supplies combine to leave practically no residual flow to the Rio Grande from Trinchera drainage." *Id.* at 77.

**24.** Tipton gave testimony at Compact Commission proceedings in 1935 that:

"[T]here are only two areas of the San Luis Valley which enter into the picture at all.... The two areas that enter the picture are the areas on the main stem of the Rio Grande above Alamosa, and the Conejos area.... The other two remaining stream systems in the live area of the San Luis Valley, in addition to the Rio Grande and Conejos, are the Alamosa and La Jara Creek areas. Those streams are fully developed."

■ We held, in Part IIA, *supra,* that the compact requires administration of the Rio Grande mainstem and Conejos River according to the delivery schedules of Article III, which were based on the contributions of those streams during the compact study period. There is no evidence that the contributions of the Alamosa, La Jara, and Trinchera Creeks were significant to the calculation of the Rio Grande mainstem's delivery obligation. The compact negotiators knew that even if diversions on these tributaries were curtailed to provide compact water, that water would be lost in transit and not reach the Rio Grande.

■ Although findings of fact derived from evidence before the trial court normally will not be disturbed on appeal, where, as here, the evidence consists entirely of written documents, an appellate court may review independently the sufficiency of the evidence and determine how that evidence will assist in construction of a compact. *See Colorado River Water Conservation Dist. v. Municipal Subdistrict, Northern Colorado Water Conservancy District,* 198 Colo. 352, 610 P.2d 81 (1979); *Sentinel Acceptance Corp. v. Colgate,* 162 Colo. 64, 424 P.2d 380 (1967). Our independent evaluation of the legislative history, coupled with the water court's finding that at the time of the compact the streams contributed little water to the mainstem, leads us to conclude that the drafters did not intend to include the normal surface flows of Alamosa Creek, La Jara Creek and Trinchera Creek under Article III compact administration, and therefore, that the state engineer does not have the authority to apply the tributary rule to these creeks.

*Proceedings of the Rio Grande Compact Commission Held at Santa Fe, New Mexico, January 28 through January 30, 1935,* 10–11. Tipton also stated:

"the stream channels [in the Trinchera area] are fairly long and it is altogether possible that [even before storage was effected and diversion made] the limited water supply produced by the basins did not reach the Rio Grande but was evaporated before it reached the Rio Grande."

*Id.* at 33.

## III.

The proposed underground water rules tie tributary underground water administration in the valley to regulation for compact requirements by integrating tributary underground water diversions into the priority system for surface streams. The rules are intended over a five-year period to curtail well diversions [25] unless individual well owners prove that their wells do not cause injury to senior water rights or remedy such injury through plans for augmentation.[26]

In support of the underground water rules, the state engineer introduced voluminous exhibits which showed that well pumping decreases artesian pressure, resulting in increased recharge to the confined aquifer from the streams in the recharge areas and decreased flow into surface streams from springs fed from the confined aquifer, and, ultimately, in streamflow depletion. The state engineer estimated that well diversions from both aquifers annually deplete the Rio Grande mainstem by 17,700 acrefeet and the Conejos River by 16,400 acrefeet. He concluded that junior well diversions were causing material injury to senior water rights throughout the valley.[27]

The water court found that the underground water was tributary to the surface streams; that surface decrees were experiencing increasing curtailment; and that underground water withdrawals had accelerated in recent years, affecting surface flows. The court also found that the effect of underground water withdrawals had not been specifically quantified and had not been attributed to individual wells. None of the parties take issue with the water court's general factual findings. Instead the rules' proponents challenge the legal bases of the water court's disapproval of the underground water rules.

### A.

■ At the outset, we address the state engineer's claims, based on *Citizens for Free Enterprise v. Department of Revenue*, 649 P.2d 1054 (Colo.1982), that the water court failed to apply a properly deferential standard of review to factual and policy determinations embodied in the under-

---

**25.** The state engineer referred specifically to the 3,600 large capacity wells which can pump more than 300 gallons of water per minute.

**26.** The burden of augmentation on individual water users is reduced by the existence of organizations such as well owners groundwater augmentation associations, which purchase senior water rights to provide augmentation service for their many members. The amount of augmentation water required to replace the approximately 34,000 acre-feet estimated by the state engineer to be lost in stream depletion to groundwater withdrawals, spread over the 3,600 well owners subject to this rule, is relatively small compared to the approximately 1,000,000 acre-feet a year of underground water withdrawals in the valley.

Proposed Rule III(D) excepts those wells from curtailment where

"the underground water appropriator submits proof to the Division Engineer and upon the basis of that proof the Division Engineer shall find:

(1) That the well or wells are operating pursuant to decreed plan of augmentation or to a decree as an alternate point of diversion, or that a change in point of diversion to the well has been decreed for a surface water right. The well or wells will then be administered in the priority system on the basis of the seniority of the associated surface decree; or

(2) That the underground water appropriation can be operated under its own priority within the priority system without impairing the right of a senior appropriator...."

In addition, Proposed Rule III(E) provides:

"Any underground water appropriator affected by these rules and regulations may use a part or all of the water produced by his well or wells without curtailment ... to the extent that such diversion is in compliance with a temporary plan of augmentation approved in accordance with Section 37–92–307, CRS 1973, as amended."

**27.** All of the information on harm from wells which the state engineer presented was general, including a study of the geohydrology of the San Luis Valley, compilation of precipitation and snowpack records, cropping pattern studies, an analysis of surface streamflow records, an analysis of surface diversions, an investigation of underground water diversions, a mass diagram net river gain analysis, and use of models to simulate well-pumping in the valley. The studies did not detail injury from any individual well, although the simulated studies used a number of individual wells to develop models and to check results.

ground water regulations.[28] Because none of the parties challenge the factual findings of the water court, the question of court deference to the state engineer's factual presentation is not before us. The state engineer's argument that the water court did not defer to the policy determinations embodied in the rules ignores the basis of the water court's decision: that the rules were not within the authority of the state engineer under sections 37–80–104 and 37–92–501 and 37–92–502, C.R.S. Court deference to policy determinations in rule-making proceedings does not extend to questions of law such as the extent to which rules and regulations are supported by statutory authority. *Colorado Auto and Truck Wreckers Association v. Department of Revenue,* 618 P.2d 646 (Colo.1980). We turn, therefore, to the propriety of the water court's legal conclusions.

### B.

In disapproving the underground water rules, the water court looked to language in

section 37–92–502(2), C.R.S. which prohibits the curtailment of a diversion unless the diversion is causing material injury to senior water rights.[29] The water court stressed the statutory reference to "each case" and "each diversion" and concluded that the materiality of injury must be determined individually for each well after consideration of the factors set out in section 37–92–502(2), stating: "[u]ntil the Division Engineer determines the materiality of injury to senior priorities caused by a specific well . . . that well may not be curtailed." To the extent that the water court ruling disapproves the rules because they presume material injury to senior rights from all junior groundwater diversions in the valley, and to the extent that the ruling requires the division engineer to re-prove in each individual well determination the existence of material injury which has already been proven on a valley-wide basis, the ruling is in error.

In *Fellhauer v. People,* 167 Colo. 320, 447 P.2d 986 (1968), this court responded to an

---

**28.** In *Citizens for Free Enterprise,* 649 P.2d at 1064, we described court deference to types of administrative rule-making decisions as a continuum:

> "On the one end of the continuum, regulations may be based primarily upon policy considerations, with factual determinations playing a tangential or unimportant role. In that context, specific factual support for the regulation should not be required, although the reasoning process that leads to its adoption must be defensible. On the other extreme, the necessity for the regulation may turn upon a discreet fact capable of a demonstrable proof. In that case, the reasonableness of agency action will depend upon the presence of factual support for its determination." (Citations omitted.)

**29.** Section 37–92–502(2) provides:

> "(2) *Each division engineer shall order the* total or partial discontinuance of any diversion in his division to the extent the water being diverted is not necessary for application to a beneficial use; and he shall also order the total or partial discontinuance of any diversion in his division to the extent the water being diverted is required by persons entitled to use water under water rights having senior priorities, but *no such discontinuance shall be ordered unless the diversion is causing or will cause material injury to such water rights having senior priorities.* In making his decision as to the discon-

tinuance of a diversion to satisfy senior priorities the division engineer shall be governed by the following: *The materiality of injury depends on all factors which will determine in each case the amount of water such discontinuance will make available to such senior priorities at the time and place of their need.* Such factors include the current and prospective volumes of water in and tributary to the stream from which the diversion is being made; distance and type of stream bed between the diversion points; the various velocities of this water, both surface and underground; the probable duration of the available flow; and the predictable return flow to the affected stream. *Each diversion shall be evaluated and administered on the basis of the circumstances relating to it* and in accordance with provisions of this article and the court decrees adjudicating and confirming water rights. In the event a discontinuance has been ordered pursuant to the foregoing, and nevertheless such does not cause water to become available to such senior priorities at the time and place of their need, then such discontinuance order shall be rescinded. If a well has been approved as an alternate means of diversion for a water right for which a surface means of diversion is decreed, such well and such surface means must be utilized to the extent feasible and permissible under this article to satisfy said water right before diversions under junior water rights are ordered discontinued." (Emphasis added.)

argument that wells could only be regulated on a case-by-case basis and that injury to a particular senior appropriator must be shown before wells could be regulated as follows:

"[W]henever a court or water administration official can make a finding that the pumping of a junior well materially injures senior appropriators who are calling generally for more water, there exists a legitimate and constitutional ground and reason for the regulation of the well, and a showing of a call against that well by a particular senior user is not necessary. In other words, we hold that, subject to the conditions hereinafter mentioned, the State Assembly may under proper channels of authority delegate to the water officials the power to protect the stream against unreasonable injury by junior wells when lower senior appropriators are not receiving, but are in need of and asking for their decreed rights."

*Id.,* 447 P.2d at 991.

This court then listed three requirements for well regulation:

"(1) The regulation must be under and in compliance with reasonable rules, regulations, standards and a plan established by the state engineer prior to the issuance of the regulative orders. (2) Reasonable lessening of material injury to senior rights must be accomplished by the regulation of the wells. (3) If by placing conditions upon the use of a well, or upon its owner, some or all of its water can be

placed to a beneficial use by the owner without material injury to senior users, such conditions should be made."

*Id.* 447 P.2d at 993.

In response to *Fellhauer,* the General Assembly in 1969 enacted section 37–92–501, C.R.S. which provides principles to guide the state engineer in adopting rules and regulations governing junior underground water diversions. After adoption of this section, the state engineer promulgated regulations which provided for curtailment of wells in the South Platte River Valley for not more than three out of each seven days, containing no requirement that the division engineer make a well-by-well determination. These regulations were upheld by this court in *Kuiper v. Well Owners Conservation Association,* 176 Colo. 119, 490 P.2d 268 (1971).[30] Similarly, in *Kuiper v. Atchison, Topeka & Santa Fe Railway Co.,* 195 Colo. 557, 581 P.2d 293 (1978), we assumed that rules, adopted by the state engineer in 1973, which provided for curtailment of well diversions in the Arkansas River Basin for not more than four days a week when necessary to prevent material injury to senior appropriators were valid without requiring an individual well-by-well determination.

■ The "each case" and "each diversion" language relied upon by the water court is found in section 37–92–502(2) and incorporated by reference into section 37–92–501.[31] This language must be read in

---

**30.** The cross-reference to section 37–92–502(2) in section 37–92–501(2) had been enacted but was not yet effective when *Well Owners* was decided. However, the opinion quoted the amended section. The holding in *Well Owners* that the regulation of wells by zones does not arbitrarily and unreasonably discriminate between two wells on either side of a zone boundary makes it clear that evaluation of the individual effect of each well is not required for the promulgation of rules.

**31.** Section 37–92–501 provides as follows:

"(1) The state engineer and the division engineers shall administer, distribute, and regulate the waters of the state in accordance with the constitution of the state of Colorado, the provisions of this article and other applicable laws, and written instructions and orders of the state

engineer, in conformity with such constitution and laws, and no other official, board, commission, department, or agency, except as provided in this article and article 8 of title 25, C.R.S. 1973, has jurisdiction and authority with respect to said administration, distribution, and regulation. *It is the legislative intent that the operation of this section shall not be used to allow ground water withdrawal which would deprive senior surface rights of the amount of water to which said surface rights would have been entitled in the absence of such ground water withdrawal, and that ground water diversions shall not be curtailed nor required to replace water withdrawn, for the benefit of surface right priorities, even though such surface right priorities be senior in priority date, when, assuming the absence of ground water withdrawal by junior priorities, water would*

the context of the purpose of section 37–92–501: to authorize the state engineer to promulgate rules and regulations to regulate underground water diversions. The purpose of the materiality of injury requirement is to prevent the futile curtailment of underground water diversions, not to erect a procedural roadblock to effective regulation of wells. *See generally* Hillhouse, *Integrating Ground and Surface Water Use in an Appropriation State,* 20 Rocky Mtn.Min. L.Inst. 691, 703–707 (1975).

■ The record before us contains ample evidence that the state engineer complied with section 37–92–501 and our holding in *Fellhauer* in considering the particular qualities and conditions of the aquifer and determining on an aquifer-wide basis that junior underground water diversions are causing material injury to senior vested water rights. Under the proposed rules, individuals retain the right in "each case" to challenge the application of this aquifer-wide determination of material injury to "each diversion." However, where, as here, streams are over-appropriated and underground water diversions from an aquifer have been found to significantly affect stream flow, it may be presumed that each underground water diversion materially injures senior appropriators. The state engineer, therefore, will not be required to repeat for every well curtailed the painstaking analysis which led to the aquifer-wide determination of material injury. *See Safranek v. Limon,* 123 Colo. 330, 228 P.2d 975 (1951) (It is presumed that all water contributes to the stream.); *cf. State v. Vick-*

*roy,* 627 P.2d 752 (Colo.1981) (Once a designated underground water basin has been established, a party asserting that certain underground water within the basin is not designated has the burden of proof.).

## C.

The water court disapproved the well regulations because they did not contain a requirement that stream appropriators tap the enormous supply of water underlying the surface of the valley. Relying upon the reasonable-means-of-diversion requirement adopted in *Colorado Springs v. Bender,* 148 Colo. 458, 366 P.2d 552 (1961) and codified in section 37–92–102(2)(b), C.R.S.; the policy of "maximum utilization" of the State's water as recognized in *Fellhauer v. People,* 167 Colo. 320, 447 P.2d 986 (1968); and the requirement under section 37–92–102(1), C.R.S., of integration of administration of underground water tributary to a stream with the use of surface water, the water court held that, under certain circumstances, surface stream appropriators have a duty to withdraw underground water tributary to the stream in order to satisfy their surface appropriations. The court observed that this may take the form of requiring senior appropriators to drill new wells to augment or replace their surface water diversions before they can require curtailment of junior rights, and that *Bender* provides that the sole limitation on seniors' duty to effectuate reasonable means of diversion is that senior appropriators cannot be required to improve their extraction facilities beyond their economic reach.

*not have been available for diversion by such surface right under the priority system.* The state engineer may adopt rules and regulations to assist in, but not as a prerequisite to, the performance of the foregoing duties.

(2) *In the adoption of such rules and regulations the state engineer shall be guided by the principles set forth in section 37–92–502(2)* and by the following:

(a) Recognition that each water basin is a separate entity, that aquifers are geologic entities and different aquifers possess different hydraulic characteristics even though such aquifers be on the same river in the same division, and that rules applicable to one type of aquifer need not apply to another type. All other fac-

tors being the same, aquifers of the same type in the same water division shall be governed by the same rules regardless of where situate.

(b) Consideration of all the particular qualities and conditions of the aquifer;

(c) Consideration of the relative priorities and quantities of all water rights and the anticipated times of year when demands will be made by the owners of such rights for waters to supply the same;

(d) Recognition that one owner may own both surface and subsurface water rights;

(e) All rules and regulations shall have as their objective the optimum use of water consistent with preservation of the priority system of water rights; ...." (Emphasis added.)

The state engineer asserts that the proposed rules properly place the burden of remedying the injury caused to senior appropriators on junior water users and that the water court's ruling is a misapplication of law. The state engineer relies upon the principle, codified in section 37–92–102, C.R.S., that the priority system governs water allocation and that junior water rights from whatever source are not entitled to divert water that otherwise would be available for use by senior water rights. *See also* sections 37–92–301(3) and 37–92–501, C.R.S. Under the prior appropriation doctrine,[32] it is argued, the burden of integrating surface and groundwater rights falls upon junior water users, primarily through plans for augmentation under section 37–92–103(9), C.R.S. *See* Hillhouse, *supra,* at 710. The state engineer also relies upon *Kuiper v. Well Owners Conservation Association,* 176 Colo. 119, 490 P.2d 268 (1971), in which this court held: "[I]t is not the present state of the law that the State Engineer is required to compel a person with a senior surface priority to use his ground water to apply on that priority before he makes a call." *Id.* 490 P.2d at 283.

In *Well Owners* the plaintiff challenged regulations requiring partial curtailment of certain wells along the South Platte River because the regulations failed to require that before a call may be placed on the river, the surface decree must be charged with the amount of water diverted by wells and applied to the same lands as served by the surface decree. The plaintiff relied on the last sentence of what is now section 37–92–502(2), C.R.S., providing that:

"... [i]f a well has been approved as an alternate means of diversion for a water right for which a surface means of diversion is decreed, such well and such surface means must be utilized to the extent feasible and permissible under this article to satisfy said water right before diver-

sions under junior water rights are ordered discontinued."

Rather than applying this provision to all situations in which a person uses ground and surface water conjunctively, and thus requiring water users to utilize all means of satisfying their entitlements before putting a call on the river, this court in *Well Owners* limited the provision to those situations in which "the well water has become related to the surface decree under the approved plan of augmentation." This court then noted:

"[W]e know of no other requirement compelling, an owner of a surface decree to first apply his well water to that decree before making the call upon junior appropriators, be they surface or underground."

*Kuiper v. Well Owners Conservation Association,* 490 P.2d at 282.

Thus, *Well Owners* sharply limited application of the state policy of maximum utilization of water first enunciated in *Fellhauer,* 447 P.2d at 994,

"It is implicit in these constitutional provisions [the two provisions are in Article XVI, Section 6 of the Colorado Constitution] that, along with *vested rights* there shall be *maximum utilization* of the water of this state. As administration of water approaches its second century the curtain is opening upon the new drama of *maximum utilization* and how constitutionally that doctrine can be integrated into the law of *vested rights*." (Emphasis in original.)

The policy of maximum utilization was codified in the "Water Right Determination and Administration Act of 1969" where the General Assembly declared

"the policy of the state of Colorado that all waters originating in or flowing into this state, whether found on the surface or underground, have always been and are hereby declared to be the property of

---

**32.** The statutory provision authorizing the state engineer to adopt rules and regulations specifically refers to the prior appropriation doctrine: "It is the legislative intent that the operation of this section shall not be used to allow ground-water withdrawal which would deprive senior surface rights of the amount of water to which said surface right would have been entitled in the absence of such groundwater withdrawal...." Section 37–92–501(1), C.R.S.

the public, dedicated to the use of the people of the state, subject to appropriation and use in accordance with law. As incident thereto, it is the policy of this state to integrate the appropriation, use, and administration of underground water tributary to a stream with the use of surface water in such a way as to maximize the beneficial use of all of the waters of this state.

(2) Recognizing that previous and existing laws have given inadequate attention to the development and use of underground waters of the state, that the use of underground waters as an independent source or in conjunction with surface waters is necessary to the present and future welfare of the people of this state, and that the future welfare of the state depends upon a sound and flexible integrated use of all waters of the state, it is hereby declared to be the further policy of the state of Colorado that in the determination of water rights, uses, and administration of water the following principles shall apply:

\* \* \* \* \* \*

(b) The existing use of ground water, either independently or in conjunction with surface rights, shall be recognized to the fullest extent possible, subject to the preservation of other existing vested rights, but, at his own point of diversion on a natural water course, each diverter must establish some reasonable means of effectuating his diversion. He is not entitled to demand the whole flow of the stream merely to facilitate his taking the fraction of the whole flow to which he is entitled.

(c) The use of ground water may be considered as an alternate or supplemental source of supply for surface decrees entered prior to June 7, 1969, taking into consideration both previous usage and the necessity to protect the vested rights of others.

(d) No reduction of any lawful diversion because of the operation of the priority system shall be permitted unless such reduction would increase the amount of water available to and required by water rights having senior priorities." [33]

Section 37–92–102(1) and (2), C.R.S.

The 1969 Act recognized in section 37–92–102(2)(b) that one method of achieving maximum utilization of water is to require that each diverter establish a reasonable means of effectuating his diversion. The section is based upon the holding in *Colorado Springs v. Bender, supra,* a case involving senior wells which used tributary water to irrigate farm land and a junior well which supplied water for Colorado Springs. The plaintiffs, senior appropriators, sued to enjoin the defendant's diversion of water in violation of the plaintiffs' rights of prior appropriation, alleging that the defendant's pumping was lowering the water table below the intake of the plaintiffs' pumping facilities. This court in *Bender* held:

"At his own point of diversion on a natural water course, each diverter must establish some reasonable means of effectuating his diversion. He is not entitled to command the whole or a substantial flow of the stream merely to facilitate his taking the fraction of the whole flow to which he is entitled.... This principle applied to diversion of underflow or underground water means that priority of appropriation does not give a right to an inefficient means of diversion, such as a well which reaches to such a shallow depth into the available water supply that a shortage would occur to such senior even though diversion by others did not deplete the stream below where there would be an adequate supply for the senior's lawful demand." (Citation omitted.)

*Colorado Springs v. Bender,* 366 P.2d at 555. The *Bender* court then directed the trial court to consider whether adequate means

---

**33.** In 1979, the General Assembly amended section 37–92–102(1) by dividing the section into a subsection (a) which is the same as the above-quoted section 37–92–102(1) except that the word "law" at the end of the first sentence is replaced with "sections 5 and 6 of article XVI of the state constitution and this article." The new subsection (b) is not relevant to the issues in this case.

for reaching a sufficient supply could be made available to the senior appropriators, and because senior appropriators cannot be required to improve their extraction facilities beyond their economic reach, whether an adequate means should be decreed at the expense of the junior appropriators. The court in *Bender* relied upon *Schodde v. Twin Falls Land and Water Company*, 224 U.S. 107, 32 S.Ct. 470, 56 L.Ed. 686 (1912), which requires a senior's method of diversion to be reasonable in order for it to be protected from injury caused by junior diversions. In *Schodde,* the means of diversion of the junior water right, a downstream dam, conflicted with the means of diversion of the senior water right, a water wheel upstream from the dam, because the dam would back up the flow of the river and prevent the water wheel from functioning. The court held that the water wheel was not entitled to the full flow of the stream to provide irrigation for 400 acres at the expense of the dam, designed to irrigate approximately 300,000 acres. The water wheel was entitled to its appropriation; it was not entitled to its means of diversion.[34]

Here, several witnesses testified that the water in storage in the valley's aquifers provides the support for the water above it to move to the streams. The well owners and the communities argue that it is not unreasonable to require surface diverters to deepen their headgates if the water from the stream is beneath their feet. The argument continues that the surface owners have lost nothing except a gravity flow source of supply which is cheaper and easier to divert, and that the loss only occurs at times when the surface stream is inadequate to fill the surface diverters' priorities. A reasonable means of diversion in this case, it is argued, is one that eliminates the need for supporting the surface stream, thereby freeing the underground water for maximum beneficial use.

The Conejos District recognizes the development of the maximum utilization of water under *Fellhauer* and the 1969 Act. However, Conejos argues that augmentation is one of the means provided to achieve maximum utilization under the 1969 Act, and that because the proposed rules require junior wells to augment, the rules are consistent with the policy of maximum utilization. Evaluation of different means of achieving maximum utilization, however, is a matter of policy, and therefore a task to be performed by the state engineer after full consideration of the available alternatives. In proposing the instant rules, the state engineer, relying upon the narrow construction of the 1969 Act in *Well Owners,* excluded consideration of the reasonableness of surface diversions, concluding that the prior appropriation doctrine prevented any means of maximizing utilization of the waters of the San Luis Valley other than what could be accomplished by augmentation plans developed by junior well owners.

■ We believe that *Well Owners* construed the 1969 Act too narrowly. The prior appropriation doctrine is not a legal barrier to the concurrent consideration by the state engineer of the various methods of implementing the state policy of maximum utilization set out in the 1969 Act. *See Baker v. Ore-Ida Foods, Inc.,* 95 Idaho 575, 513 P.2d 627 (1973); Trelease, *Conjunctive Use of Ground Water and Surface Water,* 27 Rocky Mtn.Min.L.Inst. 1853 (1982); Hillhouse, *supra;* Harrison & Sandstrom, *The Ground Water Surface Water Conflict and Recent Colorado Water Legislation,* 43 U.Colo.L.Rev. 1 (1971). Therefore, to the degree *Well Owners* precludes consideration of a reasonable-means-of-diversion requirement as a method of maximizing utilization of integrated underground

---

**34.** The state engineer attempts to distinguish the *Bender* and *Schodde* decisions on the basis that *Bender* concerned conflicts between underground water appropriations and *Schodde,* conflicts between surface appropriations. However, the 1969 Act integrated surface and underground water appropriations, thus allowing a conflict between a surface and underground water appropriation to be subject to the *Bender* doctrine as codified in the same act, section 37–92–102(2), C.R.S.

and surface waters, we overrule *Well Owners*.[35]

The water court held that, under certain circumstances, surface stream appropriators may be required to withdraw underground water tributary to the stream in order to satisfy their surface appropriations. We affirm this legal conclusion and return the proposed well rules to the state engineer for consideration of whether the reasonable-means-of-diversion doctrine provides, in this case, a method of achieving maximum utilization of water—a consideration which the state engineer erroneously believed was foreclosed. We note that the policy of maximum utilization does not require a single-minded endeavor to squeeze every drop of water from the valley's aquifers. Section 37–92–501(2)(e) makes clear that the objective of "maximum use" administration is "optimum use."[36] Optimum use can only be achieved with proper regard for all significant factors, including environmental and economic concerns. *See* section 37–92–102(3), C.R.S. (recognizing the need to correlate the activities of mankind with reasonable preservation of the natural environment); Harrison & Sandstrom, *supra*, at 14–15 (An increase of well diversions at the expense of maintenance of a surface flow would increase the efficiency of irrigation at the expense of other environmental and economic values.). *See also* Trelease, *supra*, at 1866–1872 (Determination of what constitutes a reasonable means of diversion may be more a question of the proper allocation of the costs of more efficient diversion than of the quantity of water ultimately diverted.). The water court observed that the state engineer's reconsideration might take the form of requiring senior appropriators to drill new wells before requiring curtailment of junior rights and listed a number of suggestions for increasing utilization.[37] Similarly, the state engineer's reconsideration might result in assessment to junior appropriators of the cost of making those improvements to seniors' diversions which are necessitated by junior withdrawals. Selection among these and other possibilities, including retention of the scheme of the proposed rules, is a policy decision to be made by the state engineer, after consideration of all relevant factors.

We remand the rules to the water court for return to the state engineer. Although, for the reasons set forth in Part IIA, *supra*, we affirm the water court's approval of the separate delivery rules, we suggest that, given our holding in *Kuiper v. Gould*, 196 Colo. 197, 583 P.2d 910 (1978), the separate delivery rules should be put into effect at the same time as any underground water rules or other rules pertaining to maximum

---

**35.** The water judge distinguished *Well Owners* on the basis that the well involved in *Well Owners* was an existing well and thus apparently already under priority. The water judge concluded that *Well Owners* did not preclude an administrative requirement that might obligate the senior appropriator to drill a new well to augment or replace a surface water diversion before he could require curtailment of junior rights.

**36.** Section 37–92–501(2)(e) states: "All rules and regulations shall have as their objective the optimum use of water consistent with preservation of the priority system of water rights."

**37.** Throughout the latter part of the trial, the parties' expert engineers met off the record in an attempt to agree upon a resolution of the water problems in the valley. At the conclusion of the water judge's opinion, he listed some of the engineers' suggestions as including:

(1) Elimination of the wasteful practice of subirrigation; (2) encouragement of improved irrigation efficiency, such as increased use of sprinklers; (3) prohibit the wasteful practice of allowing diverted water to collect in barrow pits, potholes and other areas, only to evaporate; (4) promote the Closed Basin Project; (5) construct new wells and use existing wells to deliver both confined and unconfined water to help satisfy Compact obligations; (6) construct new drains and rehabilitate existing drains to salvage water presently lost to non-beneficial evapotranspiration; (7) initiate channel rectification program to prevent the wasteful overflow losses on critical reaches on the river system in the valley; (8) a systematic augmentation plan for direct flow rights and wells from the confined and unconfined aquifers, pursuant to ongoing research to determine the effect of such augmentation upon senior priority rights; (9) development of reservoirs to store pre-Compact direct flow rights; (10) additional purchase of existing water rights and release of those waters to the streams.

utilization of water resources in the valley.[38] For the reasons set forth in Part IIB, *supra,* the tributary rule may not be applied to Alamosa Creek, La Jara Creek or Trinchera Creek. For the reasons set forth in Part III, *supra,* we affirm the water court's disapproval of the underground water rules. Although we approve the water court's findings of fact on this issue, which justify

the state engineer's aquifer-wide determination of material injury, Part III A–B, *supra,* we remand the rules for the state engineer's consideration of the policy of maximum utilization and the reasonable-means-of-diversion doctrine.

Judgment affirmed in part and reversed in part.

---

**38.** In *Kuiper v. Gould,* we held that the compact rules adopted under the authority of section 37–80–104, C.R.S. and the well rules adopted under the water rule power in section 37–92–501, C.R.S. were "inextricably commingled." However, in that opinion we were addressing an earlier water court ruling in this case in which the water judge then sitting held that the compact rules had to be promulgated under the procedures in the State Administrative Procedure Act, section 24–4–101, *et seq.,* C.R.S. The evidence which supports the compact rules at this stage of the proceedings is not "inextricably commingled" with the evidence that might support well regulation. However, the underground water rules as proposed by the state engineer tie administration of all underground water to the compact obligation. Consequently, unless the state engineer decides otherwise, final promulgation and enforcement of the compact rules should be delayed pending reconsideration of the regulation of tributary underground water in the valley.

Compact administration may, of course, continue in accordance with the state engineer's practice since 1969.

APPENDIX A

MAP OF
SAN LUIS VALLEY

## APPENDIX B

### Rio Grande River Compact

**37–66–101. Rio Grande River compact.** The general assembly hereby approves the compact between the states of Colorado, New Mexico, and Texas, designated as the "Rio Grande compact", signed at the city of Santa Fe, state of New Mexico, on the 18th day of March, A.D. 1938, by M.C. Hinderlider, commissioner for the state of Colorado; Thomas M. McClure, commissioner for the state of New Mexico; Frank B. Clayton, commissioner for the state of Texas, and approved by S.O. Harper, representative of the President of the United States, which said compact is as follows:

### Rio Grande Compact

The state of Colorado, the state of New Mexico, and the state of Texas, desiring to remove all causes of present and future controversy among these states and between citizens of one of these states and citizens of another state with respect to the use of the waters of the Rio Grande above Fort Quitman, Texas, and being moved by considerations of interstate comity, and for the purpose of effecting an equitable apportionment of such waters, have resolved to conclude a compact for the attainment of these purposes, and to that end, through their respective governors, have named as their respective commissioners:

For the state of Colorado—M.C. Hinderlider

For the state of New Mexico—Thomas M. McClure

For the state of Texas—Frank B. Clayton

who, after negotiations participated in by S.O. Harper, appointed by the President as the representative of the United States of. America, have agreed upon the following articles, to-wit:

### Article I

(a) The state of Colorado, the state of New Mexico, the state of Texas, and the United States of America, are hereinafter designated "Colorado," "New Mexico," "Texas," and the "United States," respectively.

(b) "The commission" means the agency created by this compact for the administration thereof.

(c) The term "Rio Grande basin" means all of the territory drained by the Rio Grande and its tributaries in Colorado, in New Mexico, and in Texas above Fort Quitman, including the closed basin in Colorado.

(d) The "closed basin" means that part of the Rio Grande basin in Colorado where the streams drain into the San Luis lakes and adjacent territory, and do not normally contribute to the flow of the Rio Grande.

(e) The term "tributary" means any stream which naturally contributes to the flow of the Rio Grande.

(f) "Transmountain diversion" is water imported into the drainage basin of the Rio Grande from any stream system outside of the Rio Grande basin, exclusive of the closed basin.

(g) "Annual debits" are the amounts by which actual deliveries in any calendar year fall below scheduled deliveries.

(h) "Annual credits" are the amounts by which actual deliveries in any calendar year exceed scheduled deliveries.

(i) "Accrued debits" are the amounts by which the sum of all annual debits exceeds the sum of all annual credits over any common period of time.

(j) "Accrued credits" are the amounts by which the sum of all annual credits exceeds the sum of all annual debits over any common period of time.

(k) "Project storage" is the combined capacity of Elephant Butte reservoir and all other reservoirs actually available for the storage of usable water below Elephant Butte and above the first diversion to lands of the Rio Grande project, but not more than a total of 2,638,860 acre-feet.

(*l*) "Usable water" is all water, exclusive of credit water, which is in project storage and which is available for release in accordance with irrigation demands, including deliveries to Mexico.

(m) "Credit water" is that amount of water in project storage which is equal to

the accrued credit of Colorado, or New Mexico, or both.

(n) "Unfilled capacity" is the difference between the total physical capacity of project storage and the amount of usable water then in storage.

(o) "Actual release" is the amount of usable water released in any calendar year from the lowest reservoir comprising project storage.

(p) "Actual spill" is all water which is actually spilled from Elephant Butte reservoir, or is released therefrom for flood control, in excess of the current demand on project storage and which does not become usable water by storage in another reservoir; provided, that actual spill of usable water cannot occur until all credit water shall have been spilled.

(q) "Hypothetical spill" is the time in any year at which usable water would have spilled from project storage if 790,000 acre-feet had been released therefrom at rates proportional to the actual release in every year from the starting date to the end of the year in which hypothetical spill occurs, in computing hypothetical spill the initial condition shall be the amount of usable water in project storage at the beginning of the calendar year following the effective date of this compact, and thereafter the initial condition shall be the amount of usable water in project storage at the beginning of the calendar year following each actual spill.

## Article II

The commission shall cause to be maintained and operated a stream gauging station equipped with an automatic water stage recorder at each of the following points, to-wit:

(a) On the Rio Grande near Del Norte above the principal points of diversion to the San Luis valley;

(b) On the Conejos river near Mogote;

(c) On the Los Pinos river near Ortiz;

(d) On the San Antonio river at Ortiz;

(e) On the Conejos river at its mouths near Los Sauces;

(f) On the Rio Grande near Lobatos;

## Article III

The obligation of Colorado to deliver water in the Rio Grande at the Colorado-New Mexico state line, measured at or near Lobatos, in each calendar year, shall be ten thousand acre-feet less than the sum of those quantities set forth in the two following tabulations of relationship, which correspond to the quantities at the upper index stations:

### Discharge of Conejos River

Quantities in thousands of acre-feet

| Conejos Index Supply (1) | Conejos River at Mouths (2) |
|---|---|
| 100 | 0 |
| 150 | 20 |
| 200 | 45 |
| 250 | 75 |
| 300 | 109 |
| 350 | 147 |
| 400 | 188 |
| 450 | 232 |
| 500 | 278 |
| 550 | 326 |
| 600 | 376 |
| 650 | 426 |
| 700 | 476 |

Intermediate quantities shall be computed by proportional parts.

(1) Conejos index supply is the natural flow Conejos river at the U.S.G.S. gauging station near Mogote during the calendar year, plus the natural flow of Los Pinos river at the U.S.G.S. gauging station near Ortiz and the natural flow of San Antonio river at the U.S.G.S. gauging station at Ortiz, both during the months of April to October, inclusive.

(2) Conejos river at mouths is the combined discharge of branches of this river at the U.S.G.S. gauging stations near Los Sauces during the calendar year.

### Discharge of Rio Grande Exclusive of Conejos River

Quantities in thousands of acre-feet

| Rio Grande at Del Norte (3) | Rio Grande at Lobatos less Conejos at Mouths (4) |
|---|---|
| 200 | 60 |
| 250 | 65 |
| 300 | 75 |
| 350 | 86 |

| Rio Grande at Del Norte (3) | Rio Grande at Lobatos less Conejos at Mouths (4) |
|---|---|
| 400 | 98 |
| 450 | 112 |
| 500 | 127 |
| 550 | 144 |
| 600 | 162 |
| 650 | 182 |
| 700 | 204 |
| 750 | 229 |
| 800 | 257 |
| 850 | 292 |
| 900 | 335 |
| 950 | 380 |
| 1,000 | 430 |
| 1,100 | 540 |
| 1,200 | 640 |
| 1,300 | 740 |
| 1,400 | 840 |

Intermediate quantities shall be computed by proportional parts.

(3) Rio Grande at Del Norte is the recorded flow of the Rio Grande at the U.S. G.S. gauging station near Del Norte during the calendar year (measured above all principal points of diversion to San Luis Valley) corrected for the operation of reservoirs constructed after 1937.

(4) Rio Grande at Lobatos less Conejos at mouths is the total flow of the Rio Grande at the U.S.G.S. gauging station near Lobatos, less the discharge of Conejos river at its mouths, during the calendar year.

The application of these schedules shall be subject to the provisions hereinafter set forth and appropriate adjustments shall be made for (a) any change in location of gauging stations; (b) any new or increased depletion of the runoff above inflow index gauging stations; and (c) any transmountain diversions into the drainage basin of the Rio Grande above Lobatos.

In event any works are constructed after 1937 for the purpose of delivering water into the Rio Grande from the closed basin, Colorado shall not be credited with the amount of such water delivered, unless the proportion of sodium ions shall be less than forty-five per cent of the total positive ions in that water when the total dissolved solids in such water exceeds three hundred fifty parts per million.

\*　　\*　　\*　　\*　　\*　　\*

## Article VI

Commencing with the year following the effective date of this compact, all credits and debits of Colorado and New Mexico shall be computed for each calendar year; provided, that in a year of actual spill no annual credits nor annual debits shall be computed for that year.

In the case of Colorado, no annual debit nor accrued debit shall exceed 100,000 acre-feet, except as either or both may be caused by holdover storage of water in reservoirs constructed after 1937 in the drainage basin of the Rio Grande above Lobatos. Within the physical limitations of storage capacity in such reservoirs, Colorado shall retain water in storage at all times to the extent of its accrued debit.

．　　．　　．　　．　　．

The commission by unanimous action may authorize the release from storage of any amount of water which is then being held in storage by reason of accrued debits of Colorado or New Mexico; provided, that such water shall be replaced at the first opportunity thereafter.

In computing the amount of accrued credits and accrued debits of Colorado or New Mexico, any annual credits in excess of 150,000 acre-feet shall be taken as equal to that amount.

In any year in which actual spill occurs, the accrued credits of Colorado, or New Mexico, or both, at the beginning of the year shall be reduced in proportion to their respective credits by the amount of such actual spill; provided, that the amount of actual spill shall be deemed to be increased by the aggregate gain in the amount of water in storage, prior to the time of spill, in reservoirs above San Marcial constructed after 1929; provided, further, that if the commissioners for the states having accrued credits authorized the release of part, or all, of such credits in advance of spill, the amount so released shall be deemed to constitute actual spill.

In any year in which there is actual spill of usable water, or at the time of hypothetical spill thereof, all accrued debits of Colorado, or New Mexico, or both, at the beginning of the year shall be cancelled.

In any year in which the aggregate of accrued debits of Colorado and New Mexico exceeds the minimum unfilled capacity of project storage, such debits shall be reduced proportionally to an aggregate amount equal to such minimum unfilled capacity.

. . . . .

## Article VII

Neither Colorado nor New Mexico shall increase the amount of water in storage in reservoirs constructed after 1929 whenever there is less than 400,000 acre-feet of usable water in project storage; provided, that if the actual releases of usable water from the beginning of the calendar year following the effective date of this compact, or from the beginning of the calendar year following actual spill, have aggregated more than an average of 790,000 acre-feet per annum, the time at which such minimum stage is reached shall be adjusted to compensate for the difference between the total actual release and releases at such average rate; provided, further, that Colorado or New Mexico, or both, may relinquish accrued credits at any time, and Texas may accept such relinquished water, and in such event the state, or states, so relinquishing shall be entitled to store water in the amount of the water so relinquished.

## Article VIII

During the month of January of any year the commissioner for Texas may demand of Colorado and New Mexico, and the commissioner for New Mexico may demand of Colorado, the release of water from storage reservoirs constructed after 1929 to the amount of the accrued debits of Colorado and New Mexico, respectively, and such releases shall be made by each at the greatest rate practicable under the conditions then prevailing, and in proportion to the total debit of each, and in amounts, limited by their accrued debits, sufficient to bring the quantity of usable water in project storage to 600,000 acre-feet by March first and to maintain this quantity in storage until April thirtieth, to the end that a normal release of 790,000 acre-feet may be made from project storage in that year.

\* \* \* \* \* \*

## Article X

In the event water from another drainage basin shall be imported into the Rio Grande basin by the United States or Colorado or New Mexico, or any of them jointly, the state having the right to the use of such water shall be given proper credit therefor in the application of the schedules.

\* \* \* \* \* \*

## Article XII

To administer the provisions of this compact there shall be constituted a commission composed of one representative from each state, to be known as the Rio Grande compact commission. The state engineer of Colorado shall be ex officio the Rio Grande compact commissioner for Colorado. The state engineer of New Mexico shall be ex officio the Rio Grande compact commissioner for New Mexico. The Rio Grande compact commissioner for Texas shall be appointed by the governor of Texas. The President of the United States shall be requested to designate a representative of the United States to sit with such commission, and such representative of the United States, if so designated by the President, shall act as chairman of the commission without vote.

. . . . .

In addition to the powers and duties hereinbefore specifically conferred upon such commission, and the members thereof, the jurisdiction of such commission shall extend only to the collection, correlation and presentation of factual data and the maintenance of records having a bearing upon the administration of this compact, and, by unanimous action, to the making of recommendations to the respective states upon matters connected with the administration of this compact. In connection therewith, the commission may employ such engineering and clerical aid as may be reasonably necessary within the limit of funds provided for that purpose by the respective states. Annual reports compiled for each calendar year shall be made by the commission and transmitted to the governors of the signatory states on or before March first following

the year covered by the report. The commission may, by unanimous action, adopt rules and regulations consistent with the provisions of this compact to govern their proceedings.

.　　.　　.　　.　　.

*　*　*　*　*　*

## APPENDIX C

IN THE MATTER OF RULES AND )
REGULATIONS GOVERNING THE )
USE, CONTROL, AND PROTEC- )
TION OF WATER RIGHTS FOR ) Proposed
BOTH SURFACE AND UNDER- ) Rules and Regulations
GROUND WATER LOCATED IN ) of the
THE RIO GRANDE AND CONEJOS ) State Engineer
RIVER BASINS AND THEIR TRIB- )
UTARIES. )

IT IS ORDERED that the following proposed rules and regulations be adopted and approved as the rules and regulations of the State Engineer in accordance with Section 37–92–501, Colorado Revised Statutes, 1973.

Any person desiring to protest any of these proposed rules and regulations may do so in the manner provided in Section 37–92–304, CRS 1973. Any protests to said proposed rules and regulations must be filed with the Water Clerk in and for the District Court of Water Division III, Alamosa, Colorado, by the end of the month following the month in which said proposed rules and regulations are published.

## PROPOSED RULES AND REGULATIONS

I. Definitions and Citations

A. These proposed rules and regulations shall affect all "waters of the state" as defined in Section 37–92–103(13), CRS 1973, which states as follows:

> "(13) 'Waters of the state' means all surface and underground water in or tributary to all natural streams within the state of Colorado, except waters referred to in section 37–90–103(6)."

and underground water is defined in Section 37–92–103(11), CRS 1973, as follows:

> "(11) 'Underground water' as applied in this article for the purpose of defining the waters of a natural stream, means that water in the unconsolidated alluvial aquifer of sand, gravel, and other sedi-

mentary materials, and all other waters hydraulically connected thereto which can influence the rate or direction of movement of the water in that alluvial aquifer or natural stream. Such 'underground water' is considered different from 'designated ground water' as defined in section 37–90–103(6)."

Wells as defined in Section 37–92–602, CRS 1973, such as those used for domestic and stock watering, shall be exempt from the provisions of these rules and regulations except for Rule III F.

B. The "Compact" referred to in these rules and regulations means the Rio Grande River Compact, as specified in Section 37–66–101, CRS 1973.

C. The stipulation agreed to by Texas, New Mexico and Colorado before the United States Supreme Court in the case of *Texas, et al. v. Colorado,* Original No. 29, October term, 1966, of the Supreme Court and the resultant Order cited in 391 U.S. 901 (May 6, 1968) is that stipulation wherein the states agreed to a continuance of the case, providing in paragraph 1 as follows:

> "The State of Colorado undertakes to deliver water at the Colorado-New Mexico state line to meet every year the delivery obligation established by the schedules of Article III of the Rio Grande Compact. To this end the State of Colorado shall exercise its best efforts and *use all available administrative and legal powers including, if necessary, the curtailment of diversions enforced by agents of the State.* The State of Colorado shall make frequent and regular reports to the plaintiffs of all measures taken to effect compliance." (emphasis added)

D. In those instances where the Compact is deficient in establishing standards for administration within Colorado, the provisions of Section 37–80–104, CRS 1973, which state as follows, shall be applicable:

> "*Compact requirements—state engineer's duties.* The state engineer shall make and enforce such regulations with respect to deliveries of water as will enable the state of Colorado to meet its compact

commitments. In those cases where the compact is deficient in establishing standards for administration within Colorado to provide for meeting its terms, the state engineer shall make such regulations as will be legal and equitable to regulate distribution among the appropriators within Colorado obligated to curtail diversions to meet compact commitments, so as to restore lawful use conditions as they were before the effective date of the compact insofar as possible."

E. The term "hydraulic divide" means that ridge in the ground water table which lies north of the Rio Grande in Colorado and which extends generally from northwest of Monte Vista to east of Alamosa. It is the approximate southern boundary of the Closed Basin as shown on Plate 1, Colorado Water Resources Circular 18, U.S. Geological Survey. Its location is subject to change as more information becomes available. This ridge prevents the natural movement of unconfined ground water from the Closed Basin into the Rio Grande mainstem and instead causes such ground water to move toward the sump area of the Closed Basin.

F. The term "confined aquifer" means that aquifer deriving its principal recharge from peripheral inflow to the Rio Grande Basin in Colorado. The confined aquifer is separated from the unconfined aquifers of the Rio Grande Basin by an aquiclude generally referred to as the blue-clay layer. The approximate limits of the blue-clay layer is as shown on Plate 2, Colorado Water Resources Circular 18, U.S. Geological Survey. These limits are subject to change as more information becomes available.

G. The term "tributary water" means any water occurring either on the surface or underground which influences the rate or direction of movement of water in a stream system.

H. The term "percentage curtailment" means that percentage of the flow at the upper index stations; i.e., Rio Grande near Del Norte, Conejos River near Mogote, Los Pinos River near Ortiz and San Antonio River at Ortiz, determined by the state

engineer to be necessary to meet Compact commitments as measured at gaging stations located on the Rio Grande near Lobatos and on the Conejos River at its mouths near Los Sauces.

II. Surface Water Administration

A. Administration of all surface water tributary to the Rio Grande or the Conejos River will be based on the fact that the delivery of certain quantities of water pursuant to the Compact constitutes the most senior water commitment in the Rio Grande and Conejos River Basins. As a result, all surface water diversions from the aforementioned systems may be regulated at those times and to the extent necessary to deliver the amount of water required pursuant to the terms of the Compact.

B. The diversion of surface water from the Conejos River and its tributaries shall be in accordance with the doctrine of prior appropriation provided that curtailment of any or all decrees in the Conejos River system may be required in order to assure that the delivery requirement as set forth in Article III of the Compact is satisfied. The contribution of the Conejos River system to meet Compact commitments shall be determined as being the combined discharge of the branches of the Conejos River as measured at its mouths near Los Sauces. The water required for Compact delivery on a calendar year basis for the Conejos River shall be as defined in the first table of Article III of the Compact except as modified in E and F below.

C. The diversion of surface water from the Rio Grande and its tributaries, except the Conejos River, shall be in accordance with the doctrine of prior appropriation provided that curtailment of any or all decrees in the Rio Grande system may be required in order to assure that the delivery requirement as set forth in Article III of the Rio Grande Compact is satisfied. The contribution of the Rio Grande system to meet Compact commitments shall be determined as being the discharge of the Rio Grande near Lobatos less the discharge of the Conejos River at its mouths near Los

Sauces. The water required for Compact delivery on a calendar year basis for the Rio Grande system, less the Conejos River, shall be as defined in the second table of Article III of the Compact except as modified in E and F below.

D. Diversion of surface waters from the Rio Grande and Conejos River systems and their tributaries shall be prohibited during the months of January, February, March, November and December except for storage in pre-compact reservoirs and for those rights decreed for beneficial use throughout the year. In the event of unusual hydrologic or climatic conditions, limited diversions during the above months may be permitted by the Division Engineer on a case by case basis.

E. The 10,000 acre-foot credit established in Article III of the Compact for credit to Colorado shall be allocated to the Conejos River and Rio Grande systems on the same percentage that each river system's delivery requirement (as determined by Article III of the Compact) to said Compact bears to the sum of such requirements. The required delivery by the Conejos River system at the mouths near Los Sauces shall be reduced by that portion of the 10,000 acre-foot credit allocable to the Conejos River and the required delivery by the Rio Grande system at the gaging station near Lobatos shall be reduced by that portion of the 10,000 acre-foot credit allocable to the Rio Grande.

F. If, because of unusual hydrologic or climatic conditions which may occur in a particular year, either the Conejos River system or the Rio Grande system appears to be unavoidably exceeding its required delivery to the Compact as defined in the respective tables in Article III of the Compact, the State Engineer may elect to credit any over-delivery in one system to the other system in order to minimize Colorado's total over-delivery at the gaging station on the Rio Grande near Lobatos.

G. Streams in the Rio Grande Basin which are found by the State Engineer to be non-tributary either on the surface or underground to either the Conejos River or to the Rio Grande shall be administered in the priority system under separate priority tabulations and shall not be required to provide water to meet Compact commitments.

H. In order to maximize the amount of water available for use by Colorado appropriators and still meet the requirements of the Compact, the State Engineer may authorize pre-compact reservoirs to store water which otherwise would have been delivered for credit at the gaging station on the Rio Grande near Lobatos; provided, that such water will remain in storage under administrative control of the State Engineer until he determines that said water is not required to meet Compact commitments. If such determination is made, the water stored for anticipated Compact delivery requirements shall revert to the ownership of the reservoir which captured such water.

If the State Engineer determines that water stored for anticipated Compact delivery requirements is needed to meet Compact requirements, such water shall be released upon demand of the State Engineer and shall be allowed to flow downstream unimpeded in any manner to the gaging station on the Rio Grande near Lobatos.

I. All water stored in pre-compact reservoirs prior to the start of the direct flow irrigation season shall be subject to the percentage curtailment in effect at the time such stored water is measured at the gaging station on the Rio Grande near Del Norte.

III. Underground Water Administration

A. Administration of all underground water tributary to the Rio Grande or the Conejos River will be based on the fact that the delivery of certain quantities of water pursuant to the Compact constitutes the most senior water commitment in the Rio Grande Basin. As a result, all tributary underground water diversions from the aforementioned systems may be regulated at those times and to the extent necessary

to deliver the amount of water required pursuant to the terms of the Compact.

B. Diversion of underground water from an aquifer hydraulically connected to surface streams (whether said aquifer be confined or unconfined) shall be permitted at those times and in those quantities necessary for the permitted beneficial use of such water except as provided in C below. Such times shall be defined as follows: For irrigation purposes, those times during which direct flow diversions are allowed from the Rio Grande or Conejos River or their tributaries, whichever is applicable; for stock or domestic uses, as exempted by Section 37–92–602, CRS 1973, only in those quantities allowed by said section, and necessary for such uses; for municipal use, on a year-round basis; for all other beneficial uses, including fish and wildlife propagation, only at those times and in those quantities necessary for the application thereof to permitted beneficial use, and when such does not constitute waste of water.

C. Unless provision is made pursuant to D and E below, the diversion of underground water from aquifers hydraulically connected to surface streams will be limited to the following schedule to provide for a reasonable lessening of material injury to senior surface appropriators.

(1) During calendar year 1976 pumping will be allowed on Monday, Tuesday, Wednesday, Thursday and Friday.

(2) During calendar year 1977 pumping will be allowed on Monday, Tuesday, Wednesday and Thursday.

(3) During calendar year 1978 pumping will be allowed on Monday, Tuesday and Wednesday.

(4) During calendar year 1979 pumping will be allowed on Monday and Tuesday.

(5) During calendar year 1980 pumping will be allowed on Monday only.

(6) During calendar year 1981 and thereafter, pumping will be totally curtailed.

This schedule shall apply to all uses of underground water, except those exempted in Section 37–92–602, CRS 1973. Water rights deriving their supply from drains or any structure or device used for the purpose or with the effect of obtaining underground water for beneficial use from an aquifer are considered to be in the same category as a diversion of underground water by wells and are subject to the provisions of this section. Upon approval of a written plan, the Division Engineer shall administer this curtailment schedule so that an underground water appropriator may have a cycle of operation to make more efficient use of the water available; provided, that senior appropriators are not materially injured thereby.

D. Underground water diversions shall be curtailed as provided under C, above, unless the underground water appropriator submits proof to the Division Engineer and upon the basis of that proof the Division Engineer shall find:

(1) That the well or wells are operating pursuant to a decreed plan of augmentation or to a decree as an alternate point of diversion, or that a change in point of diversion to the well has been decreed for a surface water right. The well or wells will then be administered in the priority system on the basis of the seniority of the associated surface decree; or

(2) That the underground water appropriation can be operated under its own priority within the priority system without impairing the right of a senior appropriator or

(3) That the water produced by a well does not come within the definition of underground water as found in Section 37–92–103(11), CRS 1973, as set forth in paragraph I–A of these rules and regulations.

E. Any underground water appropriator affected by these rules and regulations may use a part or all of the water produced by his well or wells without curtailment described in III–C, above, to the extent that such diversion is in compliance with a temporary plan of augmentation approved in

accordance with Section 37–92–307, CRS 1973, as amended.

F. All owners or users of flowing wells located in the Rio Grande Basin shall ensure that any such well be equipped with a suitable control device or be permanently capped or plugged to prevent the unlawful waste of water from such well.

The effective date of these rules and regulations is January 1, 1976.

Dated this 21st day of August, 1975.

(Signed)    C.J. Kuiper
State Engineer